IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

ELIZABETH ROSEBOOM;
AMELIA ROSEBOOM,

       *Plaintiffs*,

       v.               No. 20-cv-0399-SB

UNITED STATES OF AMERICA,

       *Defendant*.

---

Michael I. Silverman, SILVERMAN, MCDONALD & FRIEDMAN, Wilmington, Delaware.

       *Counsel for Plaintiffs.*

Dylan J. Steinberg, Jacob Laksin, U.S. ATTORNEY'S OFFICE, Wilmington, Delaware.

       *Counsel for the United States.*

---

## MEMORANDUM OPINION

December 13, 2022

BIBAS, *Circuit Judge*, sitting by designation.

    Elizabeth Roseboom and her daughter, Amelia Roseboom, were rear-ended by a slow-moving postal truck. When they exited the car, which suffered only a few hundred dollars of damage, they said they felt fine.

Now they claim that this minor accident led to major problems: severe pain, invasive surgery, and permanent disability. They are suing the United States under the Federal Tort Claims Act.

I have grave doubts about the credibility of both Roseboooms' testimony. Their testimony had many inconsistencies, and their demeanor at trial alternated between combative and evasive. So I accept their version of the facts only when supported by documentary evidence.

With that in mind, I find that the Roseboooms have proven that the accident was the proximate cause of a few weeks' sprain-and-strain injuries, but no more. And because the Roseboooms have failed to produce enough evidence to calculate damages for medical bills and lost wages, they cannot recover those. Instead, I award only minor damages for pain and suffering.

## I. FINDINGS OF FACT

### A. The Roseboooms have a history of medical problems

1. Elizabeth has a long history of back and neck pain. She was seeing doctors for back pain as early as 2004. DTX-20; DTX-21. Then, in 2007, she sought treatment for chronic back pain, stating that she had been suffering from it for four years and rating its severity as a six on a ten-point scale. DTX-52. Later that year, she sought treatment for numbness and pain in her fingers. DTX-22. An MRI revealed disc protrusion at her C5–C6 vertebrae. *Id.* Dr. Arlet, the United States' medical expert, testified that this 2007 MRI showed a degenerative disc condition and that the MRI was likely ordered because of Elizabeth's complaint of persistent neck pain. D.I. 72

at 123:4–124:7, 139:23–140:15. Dr. Arlet also testified that these spinal problems are not the sort of injuries that heal over time. *Id.* at 113:8–24.

2. Elizabeth's problems persisted. In 2010, Elizabeth continued to complain of pain in her neck and upper back and was diagnosed with a herniated disc in her lower back. DTX-23. In April 2018, four months before the accident, she saw her primary-care physician, Dr. Singh. She again complained of numbness and tingling in her fingers, plus her hands and toes. DTX-13; D.I. 71 at 159:3–24. As Dr. Arlet explained, numbness in the hands and fingers could suggest a problem with the cervical spine. D.I. 72 at 112:16–113:7, 118:4–11. Dr. Singh noted Elizabeth's history of disc disease in her cervical spine and prescribed her medication for nerve pain. DTX-13; D.I. 72 at 118:25–119:8.

3. Amelia, for her part, has a history of knee pain. She also visited Dr. Singh in April 2018. She complained that she had been experiencing knee pain for years. DTX-16; D.I. 71 at 230:6–21. Dr. Singh diagnosed a subpatellar bruise in her right knee, ordered an x-ray, and referred her to an orthopedist. DTX-16. In June 2018, Amelia returned to Dr. Singh, saying that her right knee was still hurting all the time. DTX-17. So Dr. Singh ordered an MRI, prescribed anti-inflammatory medication, and again referred her to an orthopedist. *Id.*

**B. The Rosebooms are in a minor car accident**

4. On August 27, 2018, the Rosebooms were driving their minivan in Newark, Delaware. DTX-01. Elizabeth was driving, and Amelia sat in the passenger seat. D.I. 71 at 241:25–246:1. While they stopped at a yield sign, a postal truck rear-ended them. DTX-01. The postal truck was going between 6 and 15 miles per hour. D.I. 72

at 182:21–22, 206:21–207:3. The Roseboooms' airbags did not inflate, and the car sustained $541.40 of damage to its bumper. DTX-04; D.I. 71 at 31:10–15. (The United States has already paid for the car repairs. DTX-05.)

5. The Roseboooms got out of the car to talk to James Hunley, the mailman. Elizabeth said that she was fine. D.I. 71 at 261:3–14. She wanted to leave, but Hunley told her she needed to wait for his supervisor and the police to arrive. *Id.*

6. When supervisor Bernadette Fabbroni arrived, Elizabeth told her nobody was hurt. D.I. 71 at 277:10–15. She told the police the same thing. *Id.* at 140:11–141:9. Fabbroni asked Elizabeth if she could write a statement about what happened. *Id.* at 277:16–20. While Fabbroni was taking pictures, Elizabeth called her husband. *Id.* at 277:15–20.

7. *After* the phone call to her husband, Elizabeth's story changed. She handwrote a note, which read: "I Elizabeth Roseboom [w]as driving down Salem Church Road and went to yield and slowed down to look for traffic coming and was re[a]r[-]ended. Both my daughter and myself are complaining of head and neck pain. My daughter and I went forward because we were not expecting to be hit[.] We did have our seatbelts on at the time." DTX-06. Fabbroni recalls thinking that this change of story was "very odd." D.I. 71 at 280:9–15.

8. The Roseboooms drove away from the scene of the accident. *Id.* at 141:10–12.

**C. The Roseboooms receive routine treatment**

9. The night of the accident, the Roseboooms went to urgent care. Elizabeth reported her pain as a two on a ten-point scale. P-008. Amelia was diagnosed with a right-knee contusion. P-215. Both were prescribed a ten-day supply of anti-

inflammatory medication and told to follow up with their primary-care physician. P-009; P-215.

10. Two days later, Elizabeth visited Dr. Singh. P-037. He noted restricted range of motion in her neck and a right-shoulder bruise. P-038. He prescribed non-narcotic medications and ordered a spinal x-ray. *Id.* And at two follow-up visits over the next two weeks, Dr. Singh recommended physical therapy. P-035; P-036. He also told her to stay home from her physically demanding job at an Amazon warehouse. This was consistent with how Dr. Singh had treated Elizabeth after past minor car accidents in 2001, 2005, and 2011. DTX-10, 11, 12.

11. Amelia began physical therapy for pain in her neck and right knee on September 13, 2018. DTX-53. Within a few weeks, she reported that her neck pain was resolved. DTX-54, 55; D.I. 71 at 253:17–255:5.

**D. Elizabeth is referred for pain management and surgery**

12. Michael Silverman, Elizabeth's lawyer, then referred her to Dr. Cary, a pain-management specialist with whom he had a referral relationship. D.I. 71 at 83:15–25, 161:9–162:16; D.I. 72 at 251:9–252:5. She first visited Dr. Cary's office on September 12, 2018. DTX-25. He made the same clinical observations as Dr. Singh and noted that her physical therapy was providing some relief. DTX-27. But he also described her as "totally disabled" and immediately prescribed her an opioid pain reliever instead of the anti-inflammatory medication. *Id.*

13. After Elizabeth's second visit, Dr. Cary's office took over her physical therapy. DTX-28. Over the next three visits, Dr. Cary noted that Elizabeth had full range of motion in her spine and shoulder. DTX-29, 32, 33. So after a total of nine sessions of

physical therapy, Dr. Cary discontinued Elizabeth's rehab on December 5, 2018. DTX-32.

14. Elizabeth kept seeing Dr. Cary through July 2019. At each visit, she reported her subjective level of pain as being from six to eight out of ten; Dr. Cary continued to keep her out of work as "totally disabled" or "totally incapacitated." DTX-27, 28, 29, 32, 33, 34, 35, 36, 37, 38, 39, 40. Over this time, Dr. Cary increased her dose of opioid pain relievers and discontinued non-opioid treatments. DTX-29, 34, 35, 37. After his medical license was suspended in July 2019 for over-prescribing opioids, Elizabeth stopped seeing Dr. Cary. DTX-66 at 1, 4, 68–69, 150, 154, 264–65.

15. Early during her time with Dr. Cary, he referred her to spine surgeon Dr. Rudin. DTX-29. At their first consultation, Elizabeth told Dr. Rudin that she had no previous neck injury and that her symptoms had started on the day of the accident. P-090. He recommended surgery. So on March 28, 2019, Elizabeth underwent spinal fusion surgery at the C5–C6 level, the location of her preexisting disc protrusion. P-110.

16. After the surgery, Elizabeth reported worsening pain. P-124, 120. And for the first time, she described difficulty lifting her arms above her head. P-124, 120. She was repeatedly referred to physical therapy but did not go. P-121, 115, 117; D.I. 71 at 188:15–25.

**E. Elizabeth's condition has stabilized**

17. On June 30, 2019, Elizabeth was involved in a more serious auto accident. D.I. 71 at 114:21–115:12. The airbag deployed, and she told her physician that she could not walk for four days because her feet were going numb. DTX-47.

18. Elizabeth testified that for some time after the 2018 accident, she was on Social Security for anxiety and depression, a disability that she said was unrelated to that accident. D.I. 71 at 195:18–198:12.

19. As of trial, Elizabeth has stopped all treatment other than over-the-counter pain relievers. D.I. 71 at 118:15–119:9, 128:5–9. But she still reports significant pain and diminished range of motion. D.I. 71 at 117:7–123:19. She now works as a school-bus driver. D.I. 71 at 46:14–19, 189:13–15.

## II. CONCLUSIONS OF LAW

20. The Federal Tort Claims Act makes the United States liable for the wrongful acts or omissions of its agents "under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b)(1).

21. In this suit for negligence, the United States has conceded that its agent, the mailman, breached his duty to drive reasonably. The only issues are causation and damages.

### A. Causation

22. Proximate cause is "a reasonable connection between the negligent act or omission of the defendant and the injury which the plaintiff has suffered." *Culver v. Bennett*, 588 A.2d 1094, 1097 (Del. 1991). An intervening cause can break the causal chain. *Spicer v. Osunkoya*, 32 A.3d 347, 351 (Del. 2011).

23. Elizabeth has not proven by a preponderance of the evidence that the 2018 accident caused or exacerbated her long-term neck and spinal problems. She had a degenerative spinal condition before the accident, and that preexisting condition is

7

more likely to have caused her neck and spinal problems than this minor accident. So her 2019 surgery was solely the result of a preexisting condition rather than the accident. That makes the surgery an intervening cause of her most severe symptoms, which began afterward. The more severe 2019 accident is also an intervening cause.

24. Nor has Elizabeth proven by a preponderance of the evidence that the 2018 accident caused or exacerbated her shoulder problems. Between her deposition and trial, Elizabeth went back and forth on which shoulder was hurt. *Compare* P-037, 036, DTX-27, 56; *with* D.I. 71 at 149:14–152:23, 76:24–25. And when she later saw a doctor for shoulder pain, he surmised that it was due to a neck injury. P-102. Her neck problems—which, as explained, are not attributable to the 2018 accident—are the most likely explanation for any shoulder problems she has.

25. Amelia has not proven by a preponderance of the evidence that her knee problems were caused or exacerbated by the 2018 accident. She had been suffering knee pain for years and was being treated for it shortly before the accident. So it is unlikely that a minor collision, rather than her preexisting condition, caused her continuing symptoms.

26. The Rosebooms have, however, mustered enough evidence to show that the 2018 accident caused them minor sprain-and-strain injuries lasting a few weeks. *See, e.g.*, P-037, 038. So the United States is liable for damages incurred in connection with those injuries.

**B. Damages**

27. Yet the Rosebooms cannot recover for medical expenses or lost wages. Delaware law requires that they produce actual evidence of concrete damages that

8

fall outside their personal-injury auto-insurance coverage. *Henne v. Balick*, 146 A.2d 394, 396 (Del. 1958); 21 *Del. C.* §2118(h). And the Rosebooms fail to meet their burden of production for those two categories of damages.

28. The Rosebooms did not distinguish those medical damages that were recoverable under Delaware law from those that were not. Delaware law prohibits plaintiffs from seeking recovery for expenses that are covered by the personal-injury component of their mandatory auto insurance. §2118(h). The Rosebooms have not identified which of their bills were covered by this insurance. And it appears from the face of the bills that at least some were. *Compare* P-002 *with* P-007. Plus, Elizabeth's physical-therapy bills show treatment for injuries unrelated to the accident. DTX-27; DTX-56. And finally, for some of the time, Elizabeth was eligible for Medicare—for which "the collateral source rule does not apply." *Stayton v. Delaware Health Corp.*, 117 A.3d 521, 534 (Del. 2015); D.I. 195:18–21, 196:16–18. She has not identified which bills, if any, were covered by Medicare. In all, the Rosebooms have not produced enough evidence to allow a calculation of recoverable medical damages.

29. Nor has Elizabeth produced enough evidence to allow a calculation of lost wages. At the pretrial conference, I ordered her to produce such documents and warned her that I would hold her to her burden of proof. In response, she produced only one W-2 from Amazon for the calendar year following the accident, when she was on a disability plan of unknown terms. DTX-67; D.I. 71 at 193:6–195:6. The remainder of her evidence on lost wages is her own testimony—and she cannot precisely recall how much she made at Amazon. D.I. 71 at 67:25–68:10. Neither has

she produced any evidence of the effect of taxes on her loss, despite being advised to produce her tax returns. And as above, she has not produced necessary evidence to show how much of her lost wages were available under her auto insurance. *See* § 2118(a)(2)(a)(2). Finally, because she was on Social Security after the accident for an unrelated problem, it is impossible to determine when she would have been employed but for her physical injuries. *See* 20 C.F.R. § 404.1505(a). So she has not produced sufficient evidence to support an award of lost wages. And Amelia never claimed lost wages.

30. That leaves only damages for pain and suffering based on their few weeks of sprain-and-strain injuries. Based on all the circumstances and the Rosebooms' testimony, a fair award is $1,000 for Elizabeth and $500 for Amelia.

\* \* \* \* \*

The Rosebooms were in a minor accident that caused minor injuries. Their preexisting conditions—not that accident—explain their lasting problems. And the Rosebooms have not produced enough evidence to recover most of the damages they seek. So I will award them only modest damages for pain and suffering.